Mr. Sackett, nice to see you again. Likewise, Your Honor. May it please the Court, my name is Harvey P. Sackett and I represent Andrew Neal-Allen. It's my intention to reserve at least two minutes for rebuttal. I want to quickly address one portion of the four issues raised in the opening brief and move on quickly. The fourth issue raised concerned the absence of counsel. The argument was twofold. Number one, plaintiff raised an argument regarding whether or not she'd given a well-informed waiver of the right to counsel. The second portion of the argument dealt with the implications of the lack of counsel. For the purpose of my argument this morning, Your Honors, I'm going to assume for the sake of discussion that Neal-Allen actually did give a knowledgeable waiver. However, I want to stress to the panel that she is not waiving her argument regarding the implications of the lack of counsel and the ALJ's duty to develop the record. I'm not sure I understand what you just said. You're not disputing that there was no problem with what the ALJ said to her and she went ahead unrepresentative of her own free will and volition, but there's some implications out of that that cause us to overturn what happened? Is that what you're saying? The implication, Judge Wallace, would be, assuming that she did in fact give a knowledgeable waiver, then the question remains, was she nevertheless prejudiced by the absence of counsel? Did the ALJ fully develop the record? Okay. So it really has nothing to do with the absence of counsel. It has to do with the ALJ develop the record. Better stated. Yes, Your Honor. Thank you. Okay. And the Stryis case, the ALJ has some obligation when the claimant is not represented to see that the record is developed. And actually, Your Honor, this Court has very specifically said in Vidal and its progeny that even where counsel is present, the ALJ has a duty to fully develop the record. Right. Sure. Well, that leads me to a dead end, though, because to state the general proposition that the ALJ has a responsibility to develop the record leads to the question, well, what would have been developed here? And I don't see anything. I mean, I see lots of questions that might have been asked and lots of speculation as to what might have happened, but I don't see anything that connects up an argument that says the result prejudiced your client because something different would have come out. I think I can show that, Judge Clifton. The first point, the administrative law judge concluded that Neal Allen had not shown that her mental impairment had lasted 12 months. I think it did. I think with counsel I could have proven that to the ALJ. The ALJ notes that as early as June 2001, she started receiving psychotherapy. Following that time, she was seeing a psychologist. The psychologist diagnosed major depression. She said that she was significantly depressed and could not work. This continues through May of 2002, or 11 months after she initially started receiving treatment. Okay. One point that could have been made if counsel had been present was this. There was a state agency consultative examiner, Dr. Norback. In December of 2001, he completed a form. That's on page 59 of the excerpts. There are checkboxes, and these checkboxes are very, very significant here. Number one is a box that says, will the impairment last 12 months or not, or has not lasted 12 months. He didn't check that box. He felt that it would last 12 months. Number two, contrary to the ALJ's finding of non-severity, he checked the box indicating severity and went on to complete a residual functional capacity evaluation, where he said that she was significantly limited. Wait. Are you arguing that the evidence does not support a finding that the impairment was not of 12-months duration, or are you arguing that if she had had counsel, she could have convinced the ALJ that to make a contrary finding? Predominantly the first, Judge Schroeder, and I think they go part and parcel with one another. Do we test what an ALJ does, depending upon what competent counsel would have done had they represented the plaintiff? Is that the test? I don't believe so, Judge Wallace. And my point simply is, I think it's mirrored by Judge Schroeder's last question, that I don't think, with all due respect to what the district court said and Judge Clifford's comment, I don't think it's simply a question of speculation. I think, as I just pointed out, that it's not mere hyperbole, that the record really does indicate that this did last 12 months, that any competent attorney would have pointed it out to the ALJ. The question is not whether a competent attorney would have pointed it out, but is there substantial evidence of what the ALJ found? I'll set aside the question of counsel. The ALJ's finding is not supported. And that the ALJ has a responsibility to develop the record. That's correct. So I'll set aside the question of counsel. It's not supported by the ALJ's duty to develop. It deals with his Step 5 finding. He has two hypotheticals to the vocational expert. One included a mild deficit in concentration. The other question didn't. When he asked the vocational expert, consider mild concentration deficit, can she do these three jobs? And the VE eliminated one of those jobs. The ALJ never explained why he didn't consider the answer to that question. There are two remaining jobs. One of the jobs is a page. It's a part-time job. But again, that wasn't brought up. In terms of the numbers of those two remaining jobs, they total approximately 435 or so. The ALJ said these were significant numbers. The only guideline we have is this Court's decision in Barker, where we were talking about the Los Angeles area. Here we're talking about the San Francisco Bay area. In Barker, the Court said we're comfortable saying 1,266 constitutes a substantial number. It never said, and I'm not suggesting to the Court that it was saying 1,265 or 1,264 or 1,268 was a watermark. I'm simply arguing to the Court that 435 is significantly less than 1,266, and given that, I don't think there's substantial evidence to support that finding. Now, I raised in my brief various questions to be sure. The evidence came from where? The evidence came from the vocational expert. That was unchallenged. So there was substantial evidence of that issue, of that fact. I'm sorry, Your Honor. Substantial evidence in what sense, sir? Well, you say there wasn't substantial evidence to show the jobs are available. I don't see where we get that when the expert says they are. Are you saying that isn't enough, Judge? It's not a significant number. That isn't a significant number. It's not a significant number. Do we have a test that anybody has set up as to what is a significant number, like 56 or 21 or whatever? And that's my point by referring to Barker. The answer, Judge Wallace, is we don't have a bright-line test. However, the way I read Barker, the Court was comfortable with 1,266. However, it never said that 1,366 didn't work or 1,066 didn't work. I'm simply arguing that there's a significant disparity here between 1,266 and 430. Unless the panel has any additional questions, I'll reserve the balance of my time. Thank you. Thank you, Your Honors. My name is Jean Turk. I'm here for Defendant Michael Astrew, Commissioner of Social Security. I'd like to begin by addressing my opposing counsel's claim that a development of the record would have shown that plaintiff's impairment lasted 12 consecutive months. In your view, is that the critical finding here? Is that the critical issue, the duration or not? I'm only addressing that to show you that, in fact, no attorney is a magician and could create a 12-month duration. No, that's what I'm asking you. Is the 12-month duration dispositive of this case? Yes, Your Honor. Every impairment carries with it a 12-month durational requirement, and I'm citing there the Barnhart v. Walton U.S. Supreme Court case. Every impairment isn't necessarily severe, but every severe impairment can be disabling. So you're looking at whether this is an impairment that has 12 months. My counsel had earlier suggested that the physical therapy notes somehow was proof of mental impairment. He next jumps, curiously, he next jumps to the records of Dr. Riddell in November of 2001 and kind of skips over Dr. Coulter's treatment of plaintiff. And the reason he does that is because Dr. Coulter saw plaintiff not for depression, but for treatment biofeedback that had been suggested by one of the doctors in April of 2001, that biofeedback could be an adjunct treatment to her right wrist impairment. So plaintiff saw Dr. Coulter for pain management, as the ALJ pointed out. When Dr. Coulter released claimant in November of 2001, she said claimant had vocational goals, was hardworking and motivated, but she had expressed an interest in in-depth psychoanalysis. Also during this time, plaintiff was prescribed Paxil by her doctor, shall I say, late. That's what the records say. Yeah, a lot of people who are depressed have trouble sleeping, so I'm not sure that that... In late September, however, plaintiff told Dr. Wong that she was feeling depressed about her career and she asked to see a psychiatrist. At that time, two referrals were made for her. In November of 2001, Dr. Riddell said that plaintiff had all the symptoms of major depression. Her depression, however, the factors were an aunt who had died the month before, that she was upset about her decreased quality of life, and she had a lot of unresolved resentment toward her former employer because of a lack of job advancement and an attack that had happened in 1999. Then Dr. Riddell next records two sessions that she had in late January of 2002, and again, she says claimant is well-groomed, she's articulate, again, anger towards her former employees or former employer. In late February, Dr. Riddell notes that plaintiff is to return to work on April 1st, 2002. Plaintiff, however, at this time is fearful about changing careers, taking tests, and she's anxious about going back to her former employee. The final record from Dr. Riddell is in May of 2002, and that is the last evidence of treatment of depression for this claimant. Again, Dr. Riddell talks about the depression being connected to work, plaintiff having good and bad days, and concludes that what plaintiff really needs is to find something to do with her life. Now, as you read the record, the duration of the mental impairment is what, 11 months? Your Honor, I don't think that the ALJ gave us a clear, definite beginning and end, as the district court had assumed, an 11-month period. I believe that plaintiff was treated for depression beginning in November of 2001. Based on that, her treating physicians prescribed Zoloft, which we know was helping plaintiff. There's evidence that as, I think it's December 21st, she mentioned Zoloft is helping her. In January, she says Zoloft is creating some side effects, so it's changed. But after that, there is nothing. There is nothing in this after May of 2002 that plaintiff suffered from mental impairment. And it isn't because there weren't any other records. There were certainly other records, but they failed to discuss or even mention treatment for depression or that it created any persistent functional conditions. What did they relate to? Were they for her arm? I'm sorry, Your Honor, I didn't hear you.  Yes. And this is three, well, let me just back up that. On March 22nd, 2001, that's 105 of the transcript, her treating physician said that she could return to work. The only reason that she did not return to work was because they could not accommodate the modifications caused by her repetitive stress injury. So her treating physicians were allowing her to go to work. They didn't feel there was any physical or mental impairment to her working. So after that time, there are absolutely no records. Again, we have two orthopedists who reviewed plaintiff's records. I understood plaintiff's argument raises a question on the front end, excepting for the 2002, there may not be documentation or evidence of mental impairment depression. It's been pointed out that at least by, I think it's April of 2001, there's a notation with regard to anxiety. And the argument, as I understood it, is that that was a description or perhaps a mischaracterization of the same ailment. So in fact, if you went back that far, you would go over 12 months. That is on page 51 of the transcript. And actually, my colleague misrepresents that reading. It does not state that she had worsening anxiety symptoms. It said that, if I may just take a look at that. What is the page? It's 51 of your excerpts of record. It says overall worsening symptoms. This is from a physical therapy note. I think substantial evidence supports our interpretation because the next phrase says, now constant was intermittent. Again, referring to the pain that she was experiencing in her right arm. Other evidence supporting that is none of the records talk about plaintiff going to physical therapy. That doesn't refer to anxiety? I'm sorry, Your Honor? It doesn't refer to anxiety? No, Your Honor. Overall worsening symptoms. This is from the physiotherapy associates. I read that as overall anxiety symptoms. Yeah, I did too. So, any time you've got a doctor writing something, you're often... Yes, yes. Maybe we have more experience. But again, I look to substantial evidence. Nowhere in these physical therapy notes do they refer to any of her mental conditions. I think there might be one thing where they say she's feeling good. But if you look at the second phrase, now constant was intermittent, I would say that those words all go together and they also the time that she was referred to physical therapy. The first time she was referred to a psychologist was at the end of September 2001 when she was referred to Dr. Riddell. And that is when she told her treating physician, I'm depressed. I want to see a psychiatrist. So her idea of what she was doing with Dr. Coulter with the biofeedback and the anxiety relaxation is quite a bit different than what she expected from Dr. Riddell. She saw Dr. Riddell, her medications were changed, and there's no evidence after that point. In fact, when she testified at the hearing in September of 2003, she was taking Advil, not for depression, but to help her sleep. So again, I don't feel that any attorney could pull anything out of that. I would suggest that her... She was... From my reading of the record, it was because she had once been very active with work. She advanced through work and she was feeling... She hadn't worked in almost two years at that point and was feeling anxious about her future. She had two small children, a recent divorce, a lot of reasons. But again, Your Honor, was that depression so debilitating that it would... You don't think a good lawyer could have made a case out of all of this? No, Your Honor, I don't because... She was depressed for a year and... Your Honor, there simply aren't any facts. I'm afraid I do have to sum up my reading and my discussion here. And what I want to say is that when you look at what we have here, we have a 45-year-old individual capable of light exertional level whose only limitation is an occasional limitation to reaching handling. And I feel that using common sense, a reasonable person would say that this individual was capable of work, and specifically the three jobs identified by the vocational expert and found by the judge. I want to thank you so much for your time. Appreciate it. I want to pick up on Judge Schroeder's last question. Whether or not a good attorney could have made the argument that this lasted a year, the fact remains that the ALJ could have connected the dots. He failed to do so. Contrary to opposing counsel's argument, there is a limitation. And specifically, Dr. Schwartz, who saw her in late 2002, said that she was still getting prescribed antidepressants from Dr. Wong, her treating physician. So when we pair that with Dr. Rydell's comment from September of 2002, she never released her. She never said she was all better. But rather, she said that she was going to need significant ongoing psychotherapy if, in fact, she was going to ever go back to work. Now ---- In June 2002, Dr. Wong, she saw Dr. Wong. Is that the last time she saw a doctor as far as this record is concerned? She saw no Judge Wallace. She saw consulting physicians after that time. And the report to which I refer is from September of 2002. I see. And that's on page 147 of the excerpts. What I was concerned about is Dr. Wong didn't mention anything about depression when he saw her on June 29. He was treating her mostly for her physical problems. He was a primary care physician. But he was dispensing the antidepressants. It seems to me that can we say that he is not treating her for depression, too, and he's giving medication? I don't know what the dialogue was between Dr. Wong and Dr. Rydell and Dr. Coulter. But they did work in conjunction because the referral to Dr. Coulter and Dr. Rydell came from Dr. Wong. It just struck me as strange. Maybe you could explain it to me that there's no mention of depression when Dr. Wong last sees her. I mean, on the June 29 visit. And my response would be this, Judge Walz. I don't read the absence of reference to depression as any indication that her depression has ceased. But he mentioned it before when he saw her. And I just wondered whether there's any inference that can be drawn that if he doesn't, when he mentions it before and then she comes this time and he doesn't mention it, is there any inference that can be drawn that she's at least better? He isn't concerned. The reason why I don't think that is true is because since September of 2002, some three months later, Dr. Schwartz says that she's still going to be getting antidepressants from Dr. Wong. So that would diffuse the inference that I think you're suggesting, that the absence of 2002 June should tell us that her depression had resolved. I don't think that's the case. Okay. Thank you, Your Honor. Thank you. The case just argued is submitted for decision. We'll hear the next case, Snead v. Chase. Thank you. Good morning.
judges: Wallace, Schroeder, Clifton